Not for Publication

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**PERVIS L. JACKSON,**

          **Plaintiff,**

-vs-                                    **Case No. 6:07-CV-1432-ORL-KRS**

**MICHAEL J. ASTRUE, COMMISSIONER**
**OF SOCIAL SECURITY,**

          **Defendant.**

_____

**ORDER**

This cause came on for consideration without oral argument on the Complaint filed by Pervis L. Jackson, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 10, 11. Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c). Doc. No. 16.

**I.**      **PROCEDURAL HISTORY.**

In October 2002, Jackson applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.*, (sometimes referred to herein as the Act). R. 53-55,

Not for Publication

388-91. Jackson alleged that he became disabled on June 10, 2002. *Id.* Jackson's applications were denied initially and on reconsideration. R. 28-33, 39-40, 392-401.

Jackson requested a hearing before an administrative law judge (ALJ). R. 41. An ALJ held a hearing on January 11, 2005. Jackson, represented by an attorney, testified at the hearing. R. 538-54.

After considering the testimony and the medical evidence presented, the ALJ determined that Jackson was insured under OASDI through June 8, 2005, the date of the ALJ's decision. R. 25. The ALJ found that Jackson had not engaged in substantial gainful activity since the alleged onset date of his disability. R. 20, 25.

The ALJ concluded that the medical evidence showed that Jackson had hepatitis C with mild hepatomegaly (enlarged liver), bilateral knee degenerative joint disease with previous arthrosporic surgeries, an adjustment disorder with mixed anxiety and depressed mood and a history of alcohol abuse, which were severe impairments. These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1] R. 25, ¶ 4.

The ALJ found that Jackson had the residual functional capacity (RFC) to do the following: lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk or sit for at least six hours per workday; occasionally climb, balance, stoop, kneel, crouch and crawl; perform only unskilled work with only occasional work with the general

---

[1] The Code of Federal Regulations "contains a Listing of Impairments . . . specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

public.  R. 26 ¶ 6.

In reaching this conclusion, the ALJ noted that by September 9, 2002, Jackson had full motion, with no effusion or excessive tenderness and satisfactory stability in his knee.  R. 24.  Although he continued to complain of knee pain, the ALJ observed that his September 4, 2003, knee examination was benign.  R. 24.  With respect to his mental limitations, the ALJ found that Jackson would have mild limitations in activities of daily living and moderate limitations in social functioning and maintaining concentration, persistence and pace.  R. 24.  The ALJ also found Jackson's testimony about the limitations arising from his impairments was not totally credible.  *Id*.

The ALJ looked to Jackson's report of the demands of his past relevant work as a linen porter, dishwasher and hospital housekeeper.  The ALJ found that these jobs involved lifting less than ten pounds and did not require technical knowledge or skills.  Therefore, he concluded that these jobs fell within Jackson's physical and mental RFC.  Accordingly, the ALJ concluded that Jackson was not disabled.  R. 25.

Jackson requested review of the ALJ's decision. R. 13.  He submitted additional evidence of medical treatment in 2005 and 2006 to the Appeals Council.  R. 402-537.  On August 2, 2007, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 7-10. In the decision, that Appeals Council reviewed the new evidence.  It concluded that the new evidence showed that Jackson's mental condition improved with treatment.  R. 8.  As for Jackson's knee impairment, the Appeals Council observed that Jackson had additional complaints after he jumped off of a truck in May 2005.  It observed that new knee braces improved Jackson's condition.  Therefore, the

Not for Publication

Appeals Council concluded that the May 2005 injuries did not affect Jackson's functional capacity for any period of twelve months or more. R. 8.

Jackson timely sought review of this decision by this Court. Doc. No. 1.

## II.     JURISDICTION.

Plaintiff having exhausted his administrative remedies, this Court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STATEMENT OF FACTS.

After a review of the record as a whole, I conclude that the relevant facts are adequately stated in the ALJ and Appeals Council's decision and the parties' memoranda. Accordingly, I will only summarize the facts for purposes of this order.

Jackson was 46 years old at the time of the ALJ's hearing. R. 541. He attended school through the tenth grade. R. 541. He did not obtain a GED. R. 542. He testified that he could read a newspaper, but not remember what he read. R. 549; *see also* R. 70 ("He has trouble reading.").

Jackson served in the military. R. 542. After being honorably discharged, he worked as a dishwasher in a restaurant, a linen porter in a hotel, and a housekeeper in a hospital, among other things. R. 85. Jackson reported that the job as a linen porter required him to walk or stand four hours and sit one and one-half hours per day. He carried less than ten pounds. He did not supervise others, and he was not required to use technical knowledge or skills or complete reports. R. 86. In his job as a dishwasher, Jackson walked five hours and stood four hours a day. He lifted less than ten pounds. He was required to operate machinery. R. 88. In his job as a housekeeper, he walked or

stood six hours each day, and lifted less than 10 pounds.  This job also did not require technical knowledge or skills or writing reports.  R. 91.

Medical records reflect that Jackson had chronic hepatitis C, which was treated with medication.  *See, e.g,* R. 124, 176.  An echogram performed in April 2004 revealed mild hepatomegaly.  R. 282.

The medical records also show ongoing treatment for pain and instability in both of Jackson's knees.  In March 2002, Jackson sought treatment from James H. Acker, M.D., an orthopaedic surgeon.  Jackson reported that his right knee was giving out several times a day.  R. 141.  Although x-rays were normal, Dr. Acker's assessment was that Jackson likely had a medial meniscus tear.  R. 142.  That assessment was confirmed with an MRI conducted on April 19, 2002.  R. 140, 213.  Arthroscopic surgery was performed on the right knee on June 3, 2002.  R. 134, 137, 200-03.  As of July 10, 2002, Dr. Acker opined that Jackson was not yet ready to resume his usual occupation.  R. 137.

From June through August 2002, Jackson underwent a course of physical therapy.  As of August 20, 2002, Jackson reported constant pain.  The therapist noted on examination moderate point tenderness on the back of Jackson's right knee and over the patellar tendon and along the medial joint line.  Jackson was able to walk without a cane, but he had decreased knee flexion, cadence, stride, arm swing and pelvic rotation.  R. 129.

Dr. Acker released Jackson to sedentary work in August 2002.  R. 136.  In September 2002, Jackson reported doing well with daily use of Celebrex to help to control pain.  R. 135.  Thereafter, Jackson still sought treatment for knee pain.  R. 143-

Not for Publication

44, 188, 193.

On January 7, 2003, Donald Warren Morford, M.D., prepared a physical RFC assessment after review of Jackson's records. Dr. Morford opined that Jackson could lift up to twenty pounds occasionally and ten pounds frequently. He could sit, stand or walk about six hours in a work day. He should avoid repetitive use of his right knee. He could only occasionally engage in postural activities. He must avoid hazards, such as machinery and heights. R. 148-55. In March 2003, another physician performed an RFC assessment based on a review of Jackson's records. This physician essentially concurred with Dr. Morford, except that he opined that Jackson's postural limitations restricted only his ability to climb, and he did not include a limitation on repetitive use of the right knee. R. 229-35.

In February 2003, Jackson began to have serious right knee pain. R. 262, 330. An MRI taken in May 2003, revealed an abnormality in Jackson's right knee, suggestive of chronic maceration and possible tearing. R. 278.

As of July 2003, Jackson still complained of constant pain and giving way of his right knee. R. 262. An x-ray taken in July 2003, revealed mild arthritis in Jackson's right knee. R. 320. An MRI showed a probable recurrent medial meniscus tear. Albert W. Gillespy, M.D., opined that Jackson had right knee internal derangement. R. 262. He performed arthrosporic surgery on the right knee on July 24, 2003. R. 261, 273-74. As of September 4, 2003, Jackson continued to complain of right knee pain. Dr. Gillespy found no swelling or evidence of instability in the knee. He admonished Jackson for failing to do home exercises. R. 260.

Not for Publication

Despite the surgeries, Jackson continued to have knee pain. R. 288, 309. An MRI of Jackson's left knee taken in December 2003 revealed a medial meniscus tear. Dr. Gillespy's assessment was left knee internal derangement. R. 259; *see also* R. 357 (concurring evaluation by radiologist Scott Klioze, M.D.). In January 2004, Jackson reported that his pain was worse in the morning and after sitting for any period of time. It was difficult for him to walk, and he felt spasms and a popping sensation in his left knee. R. 257. Dr. Gillespy observed that Jackson used a cane to walk. Examination revealed tenderness and snapping. R. 258. Dr. Gillespy performed arthroscopic surgery on Jackson's left knee in February 2004. R. 264.

Jackson continued to seek treatment for pain in both of his knees. *See, e.g.,* R. 298, 305, 341, 359-60, 448, 453. An MRI of Jackson's right knee taken on July 23, 2004, disclosed a probable tear of the medial meniscus associated with edema of the anterior cruciate ligament. R. 342. An MRI taken of the left knee was indeterminate for a meniscal tear. R. 343.

In May 2005, Jackson sought emergency room treatment after falling when "his knees just gave out on him." R. 404. He was treated again in June 2005, after jumping off the back of a pickup truck and injuring himself. R. 408. Thereafter, he continued to complain of knee pain. *See, e.g.,* R. 410, 414.

An x-ray taken in August 2005, revealed degenerative joint disease (DJD) with a probable mcl/acl tear in Jackson's left knee. R. 455. Subsequent x-rays disclosed DJD in the right knee also. R. 465. Knee braces were prescribed, and Jackson was referred for physical therapy. R. 461, 465. The knee braces improved Jackson's stability. R. 465. He was also treated with Hyalgan (artificial joint fluid) injections in both knees and

Not for Publication

R. 487, and Oxycodone, R. 522; *see also* Medline Plus Drug Information: Oxycodone, available online at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682132.html (last visited Sept. 8, 2008).

The records also reflect that Jackson complained of and was treated for depression. *See, e.g.,* R. 330, 367-68, 375, 448. William P. Friedenberg, Ph.D., examined Jackson at the request of the SSA in June 2003. After testing, Dr. Friedenberg found that Jackson's memory and concentration were significantly impaired. He concluded that Jackson suffered from an adjustment disorder with mixed anxiety and depressed mood, alcohol abuse in full remission, and borderline intellectual functioning. R. 237-38.

Later in June 2003, Susan Conley, Ph.D., prepared a mental RFC assessment based on a review of Jackson's records. Dr. Conley opined that Jackson's mental impairment would result in moderate difficulties in maintaining concentration, persistence and pace. R. 249, 255.

VA records reflect that Jackson's Global Assessment of Functioning (GAF) score was 55 in December 2004. R. 368. As of July 18, 2005, VA records reflect that Jackson's dysthymia was in good remission, with a GAF score of 65. R. 438.

At the hearing, Jackson testified that he still had weakness and pain in both knees, and sometimes he fell. R. 544, 546. He also indicated that he was nervous and depressed. R. 548. He took pain medication and Zoloft. R. 548. Medication did not cause any side effects except that he could not drive. R. 543, 552.

Jackson estimated that he could sit and stand about twenty minutes at a time. He could lift about ten pounds. He could bend "a little bit." R. 549. He could walk about

Not for Publication

twenty minutes leaning on something for support. R. 550. He spent much of his time during the day lying down. R. 550.

## IV.   STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

Not for Publication

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)(per curiam)(citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel*, 800 F.2d at 1030.

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "[i]n practice, the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988)(citing *Bridges v. Bowen*,

Not for Publication

815 F.2d 622, 624 (11th Cir. 1987)).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988)(internal citation omitted). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994)(citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

Not for Publication

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**V.    ANALYSIS.**

Jackson asserts several grounds for reversal. With respect to his knee impairments, he argues that the ALJ did not consider the record as a whole, including failing to address Dr. Morford's opinion that Jackson should avoid repetitive use of his right knee. With respect to his mental impairment, Jackson argues that the ALJ erred in failing to explain why he did not credit Dr. Friedenberg's opinion, and failing to determine the mental demands of his past relevant work. I address in detail only the ALJ's failure to consider the record as a whole regarding Jackson's knee impairments, because I find that issue to be dispositive.

Under the pain standard followed in this circuit, the Commissioner "must consider a claimant's subjective testimony of pain if [he] finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from the condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

As Jackson correctly argues, the evidence before the ALJ, as supplemented by the evidence presented to the Appeals Council,[2] established objectively determined

---

[2] "[A] federal district court must consider evidence not submitted to the administrative law judge but considered by the Appeals Council when that court reviews the Commissioner's final decision denying Social Security benefits." *Ingraham v. Comm'r*, 496 F.3d 1253, 1258 (11th Cir. 2007). Accordingly, in reviewing the Commissioner's decision, I consider all of the evidence in the record.

Not for Publication

medical conditions of such a severity that they could reasonably be expected to support Jackson's complaints of ongoing pain and instability in his knees. MRIs and arthroscopic surgeries revealed that Jackson had internal derangement of both knees, including medial meniscus tears in his right knee in March and May of 2003, and a medial meniscus and anterior cruciate ligament tear in his right knee in July 2004. He had a medial meniscus tear in his left knee in July 2004. By August 2005, he had degenerative joint disease in both knees, and he was required to use braces on each knee.

The ALJ relied upon Dr. Morford's RFC assessment in January 2003, and Dr. Gillespy's finding in September 2003 that examination of Jackson's knee was benign as evidence that Jackson's condition was not as limiting as he reported it to be. The ALJ's citation to these two isolated instances in the record is insufficient to undermine the medical evidence showing that Jackson had chronic right knee impairments since March 2002, and left knee impairments since December 2003. *Cf. Foote*, 67 F.3d at 1561 (citation to limited parts of the record insufficient to overcome pain standard).

Similarly, the Appeals Council's conclusion that Jackson's complaints of knee pain in 2005 arose from the injury he suffered when he jumped from a pickup truck and were resolved by knee braces is not supported by substantial evidence in the record. The medical records show, as the ALJ found, that by August 2005, Jackson suffered from degenerative joint disease. While braces improved Jackson's knee stability, he still suffered from severe pain. His complaints of pain were credited by his treating physicians, as shown by the treatment with Oxycodone, a narcotic pain medication.

Not for Publication

Because substantial evidence in the record does not support the Commissioner's conclusion about the limitations arising from Jackson's knee impairments and associated pain, remand is required to permit the Commissioner to reassess the evidence under the proper legal standards.

On remand, the Commissioner should also revisit his findings regarding the functional limitations arising from Jackson's mental impairments and the impact of those limitations on Jackson's ability to return to his past relevant work or other work available in the national economy.  *See* Soc. Sec. Ruling 82-62, 1982 WL 31386, at * 3 ("Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations. Detailed information about strength, endurance, manipulative ability, *mental demands* and other job requirements must be obtained as appropriate.")(emphasis added).

**VI.   CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** this 9th day of September, 2008.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE